**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:26-cr-17 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| KE-SHAWN RIVERS, | : | |
| | : | |
| Defendant. | : | |

---

# ENTRY AND ORDER DENYING MOTION TO SUPPRESS EVIDENCE (DOC. NO. 25)

---

Currently before the Court is Defendant Ke-Shawn Rivers' ("Rivers") Motion to Suppress Evidence and Request for *Franks* Hearing[1] (Doc. No. 25) (the "Motion). By superseding indictment, the Grand Jury charged Rivers with the following offenses: thirteen counts of distribution of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); one count of possession with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)–(B); one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and lastly, one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). (*See* Doc. No. 15 at PageID 40–42.) By his Motion, Rivers seeks "to suppress all evidence seized from the premises located at 1750 Princeton

[1] Rivers' Motion not only includes argument in favor of suppressing evidence found at 1750 Princeton Drive (the "Princeton Residence") but also requests a *Franks* hearing. (*See generally* Doc. No. 25.) On October 28, 2026, the Court denied Rivers' request for a *Franks* hearing but left untouched Rivers' suppression arguments. (*See* Doc. No. 31.) Having disposed of Rivers' *Franks* request, and seeing as Rivers withdrew his suppression arguments as to another residence in dispute (*see* Doc. No. 29 at PageID 175)—217 Westwood Avenue (the "Westwood Residence")—the Court proceeds only with the Parties' papers as they pertain to suppression of the evidence found at the Princeton Residence.

Drive, Dayton, Ohio, as well as any fruits from that unlawful search." (Doc. No. 25 at PageID 60.) For the reasons articulated herein, the Court **DENIES** Rivers' Motion.

## I. BACKGROUND

As indicated, Rivers seeks to suppress all evidence derived from the execution of a search warrant at the Princeton Residence[2] (the "Search Warrant")[3]. (*See* Doc. No. 25 at PageID 60.) Special Agent Tyler Simpson ("SA Simpson") with the Department of Homeland Security served as the affiant for the Search Warrant. (*See* Doc. No. 25-1 at PageID 67.) However, the majority of the investigation regarding Rivers' alleged involvement in drug trafficking was conducted by Task Force Officer Miller ("TFO Miller") with Homeland Security Investigations, who worked in conjunction with SA Simpson and relayed all pertinent information regarding his investigation. (*Id*. at PageID 70.) For brevity, the Court paraphrases the crucial facts contained in the Search Warrant affidavit for the Princeton Address. (*See id*. at PageID 70–94.)

Law enforcement first began investigating Rivers around May of 2025. (*Id*. at PageID 70.) An overdose death in April of 2025 incepted law enforcement's suspicion of Rivers, when officers learned that Rivers allegedly sold narcotics to the diseased around the time of their death. (*Id*.) Shortly thereafter, TFO Miller enlisted a confidential source ("CS"), "who knew Rivers and ha[d] historically purchased fentanyl from Rivers." (*Id*.) That CS agreed to cooperate with law enforcement in the performance of various controlled purchases with Rivers. (*Id*.) What ensued was approximately seven months' worth of controlled purchases, GPS surveillance, and in-person surveillance. (*Id*. at PageID 70–94.) In total, law enforcement conducted 17 controlled purchases—

[2] As further delineated below, neither Party disputes that, at the time of the investigation leading to the Princeton Residence search and Rivers' consequent prosecution, Rivers' primary address was the Westwood Residence, not the Princeton Residence. (*See* Doc. Nos. 25 at PageID 61; 28 at PageID 169.)

[3] Attached to Rivers' Motion is law enforcement's application for the Princeton Residence Search Warrant, along with its accompanying affidavit. (*See* Doc. No. 25-1.) The Court references said Search Warrant for its factual basis.

three of which were accomplished with the assistance of the CS, and the rest of which were executed by an undercover officer, who the Search Warrant affidavit refers to as "UC2." (*Id.*) Although Rivers' methods of operation followed very formulaic patterns throughout his encounters, the Court briefly highlights certain events below. (*See id.*)

As noted, TFO Miller enlisted the CS to facilitate three controlled purchases, the first of which occurred on July 25, 2025. (*Id.* at PageID 70–71.) It should be noted that prior to each of the three controlled purchases involving the CS, law enforcement searched the CS for contraband preceding their execution. (*Id.* at PageID 71–76.) Additionally, all 17 of the controlled purchases were conducted with the assistance of recording devices. (*Id.* at PageID 71–94.) All but one time, Rivers was contacted by phone—either by the CS or by UC2—and was met in a random location to execute the drug deal. (*Id.*) The only exception was a controlled purchase on February 19, 2026, when Rivers sold drugs to UC2 from his primary residence, the Westwood Residence; otherwise, all purchases were made at locations other than those associated with Rivers. (*Id.*) The first, July 25 controlled purchase was no different. The CS called what was known to be Rivers' phone number to arrange a drug deal. (*Id.* at PageID 71.) As with all but one other controlled purchase, Rivers directed the CS to a random location. (*Id.*) Rivers arrived in one of the three vehicles he is known to own, a black Audi Q5.[4] (*Id.*) Upon arrival, the CS entered Rivers' Audi and exchanged buy funds for suspected fentanyl. (*Id.*) The CS was able to confirm Rivers' identity based on previous encounters with him. (*Id.* at PageID 71–72.) The suspected narcotics were later tested in a lab, which confirmed the substance purchased was fentanyl. (*Id.* at PageID 72.)

Out of all 17 controlled purchases, there is very little variance. Almost all transpired in the

[4] Through their investigation, law enforcement learned that Rivers owns and frequently uses three vehicles: (1) an Audi Q5 ("Rivers' Audi"), (2) a Chevy Silverado ("Rivers' Chevy"), and (3) a Nissan Sentra ("Rivers' Nissan"). (*See* Doc. No. 25-1 at PageID 71–74.) All vehicles were registered under Rivers' name and to the Westwood Residence. (*Id.*)

manner described above: Rivers was contacted either by the CS or UC2[5] to arrange a drug transaction, the CS or UC2 met Rivers at a seemingly random location, Rivers arrived in one of his three known vehicles, and Rivers personally handed drugs to the purchaser in exchange for buy money. (*Id*. at PageID 71–94.) The only discernable divergences in Rivers' modus operandi are as follows. On January 6, 2026, Rivers contacted UC2 via text and informed UC2 that he had secured a new phone number, which thereafter became the medium for their conversations, as opposed to his previous phone number. (*Id*. at PageID 87–94.) What's more, Rivers enlisted assistance in 4 of the 17 controlled purchases, meaning, he sat in one of his three vehicles while an unknown individual transported drugs to either the CS or UC2 in exchange for money. (*Id*. at PageID 74–94.) Setting aside those 4 purchases, Rivers personally handed fentanyl to either CS or UC2 on 9 different occasions. (*Id*. at PageID 71–94.) Finally, only one of the controlled purchases occurred at a location associated with Rivers—the Westwood Residence—on February 19, 2026, when Rivers personally handed UC2 fentanyl. (*Id*. at PageID 93.)

Yet, the commonalities in Rivers' dealings far outweigh the distinctions. For each deal, Rivers was contacted by phone in solicitation of drugs; Rivers directed the prospective purchaser to a particular location, most often unrelated to his residence; the purchaser wore a recording device; Rivers arrived to the agreed location in one of his three vehicles; Rivers or one of his cohorts exchanged fentanyl for buy money; and the substances purchased lab tested positive for fentanyl. (*Id*. at PageID 71–94.) Based on SA Simpson and TFO Miller's joint investigation, SA Simpson applied for the Search Warrant, which Magistrate Judge Peter Silvain authorized on March 9, 2026. (*Id*. at PageID 66, 100.) The Grand Jury thereafter returned its initial indictment

[5] UC2 first accompanied the CS on the third of 17 controlled purchases. (*See* Doc. No. 25-1 at PageID 74.) Following the CS's introduction of UC2 and Rivers, along with a third controlled purchase on October 1, 2025, the CS's involvement was discontinued, and UC2 conducted all subsequent purchases independently. (*Id*. at PageID 75–94.)

on March 10, 2026 (Doc. No. 4), followed by a 16-Count Superseding Indictment on April 28, 2026 (Doc. No. 15). Rivers was arrested on March 11, 2026, and has remained in custody as of the date of this Order. (*See generally* Doc. No. 12.)

On September 7, 2026, Rivers filed his Motion (Doc. No. 25). The Government responded on October 5, 2026 (Doc. No. 28), and Rivers replied on October 14, 2026 (Doc. No. 29). Consequently, the Court considers this matter ripe for review and decision.

## II. LEGAL STANDARD

A criminal defendant may seek the suppression of evidence by filing a pretrial motion with the Court. FED. R. CRIM. P. 12(b)(3)(C). "It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003). When a party seeks to challenge an allegedly unconstitutional search, the Fourth Amendment governs. *See Colson v. City of Alcoa*, 37 F.4th 1182, 1186 (6th Cir. 2022). At bottom, the Fourth Amendment of the Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. AMEND. IV. Under the Fourth Amendment, law enforcement may generally not conduct a search before obtaining "a warrant from a neutral and disinterested magistrate." *Franks v. Delaware*, 438 U.S. 154, 164 (1978). To this end, it is expected that a magistrate will not issue a search warrant without a showing of probable cause to justify the requested search. *United States v. Abboud*, 438 F.3d 554, 569 (6th Cir. 2006) ("Only if the magistrate finds probable cause can she issue a search warrant"). Altogether, the Fourth Amendment protects against unreasonable

searches and seizures by "requiring that [the usual inferences which reasonable men draw from evidence] be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Illinois v. Gates*, 462 U.S. 213, 240 (1983) (quoting *Johnson v. United States*, 333 U.S. 10, 13-14 (1948)) (alterations in original).

When applying for a search warrant, the government necessarily bears the burden of establishing probable cause. *Abboud*, 438 F.3d at 569 (citing FED. R. CRIM. P. 41(c); *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996)). To meet its burden, the government is expected to offer an affidavit containing "facts that indicate 'a fair probability that evidence of a crime will be located on the premises of the proposed search.'" *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (quoting *United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005)). The government need not possess evidence that would secure a conviction beyond a reasonable doubt. *Wong Sun v. U.S.*, 371 U.S. 471, 479 (1963). Rather, "probable cause is a fluid concept" inherently tied to "an assessment of probabilities" and based on variable and particularized facts. *Gates*, 462 U.S. at 231.

Magistrate judges reviewing an affidavit for probable cause must draw from the totality of the circumstances presented in the government's affidavit. *See id.*; *see also Wong Sun*, 371 U.S. at 479 (Probable cause "must be measured by the facts of the particular case."). By the totality of the circumstances, a magistrate's probable cause determination will generally stand when she had a substantial basis for concluding that the search would turn up evidence of criminality. *Gates*, 462 U.S. at 236 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). In the end, whatever lies within the four corners of the government's affidavit will dictate whether a magistrate had a substantial basis for her probable cause determination. *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010) (citing *United States v. Pinson*, 321 F.3d 558, 565 (6th Cir. 2003)). Moreover, a

magistrate judge's probable cause determination should most often "be paid great deference." *Gates*, 462 U.S. at 236 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)).

With certain exceptions, any evidence obtained as a result of an unlawful search cannot be used as evidence against the victim of the search. *Wong Sun*, 371 U.S. at 484 (citing *Weeks v. United States*, 232 U.S. 383 (1914)). One such exception to the exclusionary rule is the good-faith reliance exception. *See United States v. Leon*, 468 U.S. 897, 905 (1984). "Though evidence obtained in violation of the Fourth Amendment is generally excluded, the Supreme Court has held that the exclusionary rule 'should be modified so as not to bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective.'" *Frazier*, 423 F.3d at 533 (quoting *Leon*, 468 U.S. at 905). In assessing whether an officer's reliance meets this exception, the "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n. 3. In so doing, courts are to consider "all of the circumstances" surrounding the search warrant application. *Id*.

## III. <u>ANALYSIS</u>

Rivers' Motion raises three primary arguments in favor of suppression: (1) the Search Warrant affidavit "fails to establish a nexus between the suspected criminal activity and [the Princeton Residence]"; (2) the "information relied upon to search the [Princeton Residence] was impermissibly stale"; and alternatively, (3) the *Leon* good-faith exception does not apply. (Doc. No. 25 at PageID 62–64.) However, because neither side disputes that Rivers' primary home was the Westwood Residence, not the Princeton Residence, it is incumbent on the Court, as a threshold matter, to determine whether Rivers' contacts with and privacy interest, if any, in the Princeton Residence sufficiently confer him standing to seek suppression of the evidence located therein. *United States v. Davis*, No. 6:06-CR-00386, 2007 WL 490088, at *8 n. 13 (N.D. Ohio Feb. 8,

2007) (noting "a defendant's standing to seek an order of suppression is a threshold issue that the Court must always assess"). Therefore, before reaching Rivers' arguments, the Court tackles the issue of standing.

### A. Standing

Generally speaking, "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969) Thus, "in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i.e.,* one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 n. 12 (1978)). The subject of a search warrant need not be the defendant's "'home,' temporary or otherwise, in order for him to enjoy a reasonable expectation of privacy there[,]" for the "Fourth Amendment protects people, not places and provides sanctuary for citizens wherever they have a legitimate expectation of privacy." *Minnesota v. Olson*, 495 U.S. 91, 96 n. 5 (1990) (internal citations and quotation marks omitted). Simply put, "when a person objects to the search of a place and invokes the exclusionary rule, he or she must have the requisite connection to that place." *Id*. at 99 (Kennedy, J., concurring). For the exclusionary rule to apply, "[a] defendant must satisfy a two-pronged test to show a legitimate expectation of privacy: 1) he must manifest an actual, subjective expectation of privacy; and 2) that expectation is one that society is prepared to recognize as legitimate." *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000).

The rules regarding the privacy rights of overnight guests are relatively settled. *See generally Olson*, 495 U.S. 91; *see also United States v. Knowledge*, 418 F. App'x 405, 407

(6th Cir. 2011) ("The Supreme Court has recognized an overnight guest's legitimate expectation of privacy in his host's home." (citation and quotation marks omitted)). But while "[a] person—whether social guest or renter—has a reasonable expectation of privacy in the place where he sleeps at night[,]" the same cannot always be said for more ephemeral invitees. *United States v. Allen*, 720 F. App'x 254, 257 (6th Cir. 2018). For instance, "one who is merely present with the consent of the householder may not" claim the protections of the Fourth Amendment. *Carter*, 525 U.S. at 90. "This is particularly true where . . . the person seeking the protections of the Fourth Amendment was on the premises for the sole purpose of engaging in drug-related business transactions." *United States v. Harris*, 255 F.3d 288, 295 (6th Cir. 2001). "To otherwise have a reasonable expectation of privacy as a guest at another person's residence, a defendant must 'establish that he has a meaningful connection to the residence.'" *United States v. Carney*, No. 24-6051, 2026 WL 813847, at *5 (6th Cir. Mar. 24, 2026) (quoting *United States v. Haynes*, 108 F. App'x 372, 374 (6th Cir. 2004)). "Evidence of such a connection includes that the defendant was staying at the residence recently, occasionally stayed overnight, kept personal items there, had a relationship with the residents, or could stay there even when other residents were gone." *United States v. James*, No. 3:24-CR-87, 2026 WL 2364238, at *11 (E.D. Tenn. Aug. 14, 2026).

Based on a review of the record, the Court is able to gather the following connections between Rivers and the Princeton Residence. First, while conducting in-person surveillance, TFO Miller observed either Rivers or one of his three vehicles at the Princeton Residence on at least three separate occasions. (*See* Doc. No. 25-1 at PageID 73, 83.) Second, TFO Miller applied for and secured GPS search warrants for both Rivers' Audi and his Chevy. (*Id.* at PageID 72–73.) TFO Miller noted that the GPS trackers revealed that either the Audi or Chevy was parked at the Princeton Residence on four documented occasions. (*Id.* at PageID 77–81.) During the latter two

of said occasions, Rivers' vehicle remained parked at the Princeton Residence overnight. (*Id*. at PageID 79–81.) When researching the ownership status of the Princeton Residence, TFO Miller discovered that Rivers' former legal guardian owned the Princeton Residence. (*Id*. at PageID 83.) Finally, an examination of the utility payments revealed that Rivers' credit card, which was used to pay for the Westwood Residence's electricity bill, was also used to pay for the Princeton Residence's electricity. (*Id*.)

Based on Rivers' ties to the owner of the Princeton Residence; his various visits to the location, some of which spanned overnight; and his payment of the Princeton Residence's utility bills; it is abundantly clear that Rivers manifested a subjective expectation of privacy in the Princeton Residence, and that expectation is one that society is prepared to recognize as legitimate. In other words, Rivers' contacts with the Princeton Residence are sufficient to confer him standing to bring his Motion.

**B. <u>Nexus Between the Suspected Criminal Activity and the Princeton Residence</u>**

Having disposed of the issue of standing, Rivers' arguments in favor of suppression are fairly straightforward. Rivers maintains that "[b]ecause the affidavit contains zero factual observations of drugs, drug proceeds, or drug transactions actually occurring at [the Princeton Residence], it fails the nexus requirement." (Doc. No. 25 at PageID 62.) The Government, meanwhile, argues that Rivers holds the Government to too tall a burden, and the affidavit does, in fact, establish a sufficient nexus because the probable cause standard does not require that the drug transactions occur at the subject residence. (Doc. No. 28 at PageID 160.) And while the Government concedes that law enforcement executed no controlled purchases at the Princeton Residence, it is the Government's position that that fact carries little weight—the reason being,

Rivers' connections with the Princeton Residence, viewed in conjunction with the evidence of 17 controlled purchases, is damning. (*Id.* at PageID 172.) The Court concurs with the Government.

It is well settled that the "Sixth Circuit does not require law enforcement to observe illegal activity in a suspect's residence to justify a warrant to search that residence." *United States v. Stallings*, No. 5:23-CR-00198, 2025 WL 1635429, at *9 (N.D. Ohio June 9, 2025) (citing *United States v. Coleman*, 923 F.3d 450, 457 (6th Cir. 2019)). Crucial here, the Sixth Circuit has "repeatedly held that probable cause exists to search a residence for drug-related evidence when a drug dealer travels directly from that residence to the site of the drug deal." *United States v. Miller*, 850 F. App'x 370, 371 (6th Cir. 2021).

Here, the Search Warrant indicates that, on October 8, 2025, TFO Miller arranged a drug deal between Rivers and UC2. (Doc. No. 25-1 at PageID 76.) According to the affidavit, Rivers directed UC2 to a random location to carry out the deal. (*Id.*) UC2, who was well acquainted with Rivers and had participated in multiple controlled purchases at that point, verified that Rivers was the individual who met him and sold him fentanyl. (*Id.*) Additionally, a review of the GPS tracking data revealed that Rivers' Audi was "at the deal location during the deal" and, just "prior to the deal[,]" was parked in the driveway of the Princeton Residence. (*Id.* at PageID 77.) Another time, on the morning of December 4, 2026, law enforcement observed Rivers exit the Princeton Residence and enter his Audi. (*Id.* at PageID 83.) Approximately 10 minutes after observing Rivers exit the Princeton Residence, UC2 contacted Rivers to arrange a drug deal, and Rivers informed UC2 he was "ready to complete the deal." (*Id.* at PageID 84.) However, "[d]ue to operational needs," law enforcement was unable to complete the controlled purchase until later that day. (*Id.*) Presumably, but for law enforcement's conflict, Rivers would have, once again, left directly from the Princeton Residence to execute a drug deal. All that is to say, the Court is able to sufficiently

deduce that Rivers drove his Audi from the Princeton Residence directly to the site of a drug deal on at least one occasion. The affidavit's lack of recorded controlled purchases at the Princeton Residence is inconsequential because law enforcement documented a plethora of controlled purchases with Rivers and adequately confirmed Rivers' association with the Princeton Residence.

That said, Rivers' nexus argument is unavailing, and Magistrate Judge Silvain had a substantial basis for his probable cause determination in issuing the Search Warrant.

### C. Staleness of the Evidence

For his second argument, Rivers maintains that the information relied upon to search the Princeton Residence was impermissibly stale. (Doc. No. 25 at PageID 62.) In support of his contention, Rivers points to this purportedly faulty sequence of events:

> The last time agents observed [] Rivers at [the Princeton Residence] was December 4, 2025. Agents observed [] Rivers exit the [Princeton Residence] at 9:41 a.m., get into his vehicle, and drive away. Nearly five hours later, at 2:29 p.m., [] Rivers participated in a controlled drug transaction at a completely different location. The warrant was not sought until March 9, 2026—more than 90 days later. A three-month gap without any further sightings renders the evidence hopelessly stale.

(*Id*. at PageID 62.)

Unfortunately, Rivers' second argument fares no better than the first. True, the last time law enforcement personally observed Rivers physically present at the Princeton Residence was December 4, 2025. (Doc. No. 25-1 at PageID 83.) However, the final documented controlled purchase involving Rivers occurred on February 25, 2026—fewer than two weeks before the execution of the Search Warrant. (*Id*. at PageID 93–94.) Perhaps had more time elapsed between the final controlled purchase and the execution of the Search Warrant, Rivers' argument might be more availing. *United States v. Brooks*, 594 F.3d 488, 493 (6th Cir. 2010) ("In the context of drug crimes, information goes stale very quickly 'because drugs are usually sold and consumed in a prompt fashion.'" (quoting *United States v. Frechette*, 583 F.3d 374, 378 (6th Cir. 2009)). But that

is not Rivers' position here. Instead, he contends that the evidence of his connection to the Princeton Residence, not that of his documented drug dealings, was rendered stale by the duration of time between his last sighting there and the search.

By way of support, Rivers references *United States v. Hython*, 443 F.3d 480 (6th Cir. 2006). (*See* Doc. No. 25 at PageID 62.) For pivotal reasons, *Hython* is distinguishable. In *Hython*, law enforcement only executed one controlled purchase, and "neither the affidavit nor the warrant specified the date on which the transaction at the defendant's house took place." 443 F.3d at 483. Because the affidavit provided insufficient evidence from which to conclude the subject residence was the site of an "ongoing and continuous" drug enterprise, it fell short of the probable cause standard. *Id*. at 485–86. Yet, *Hython* is not without useful guidance. There, the Sixth Circuit emphasized that its staleness ruling was unique to the facts of that particular case and further held that "[t]he inclusion of outdated information has been insufficient to render an entire affidavit stale when the affidavit as a whole establishes that the criminal activity in question is ongoing and continuous . . . ." *Id*. at 485. In coming to its conclusion that the warrant there was invalid on staleness grounds, the *Hython* court saw fit to distinguish another case, where it came to the opposite conclusion: "The number of controlled buys, in combination with ongoing observation of the comings and goings at the residence, established probable cause to believe the residence continued to be an operational base for a drug ring." *Id*. (citing *United States v. Greene*, 250 F.3d 471 (6th Cir. 2001)).

The facts of the present case are much more analogous to those in *Greene*. As recounted ad nauseam, law enforcement here conducted a total of 17 controlled purchases involving Rivers, the last of which was only about two weeks before the Search Warrant's execution. (*See* Doc. No. 25-1 at PageID 71–94.) So, while Rivers' final sighting at the Princeton Residence was indeed

several months prior to the search, his documented drug involvement was not. The Court strains to conceive of how Rivers' long-established ties with the Princeton Residence suddenly evaporated in the few months preceding the search simply because his documented sightings there became sparser. It also bears noting that the GPS units on Rivers' Audi and Silverado ran out of battery around late October of 2025 and were never replaced. (*See id.* at PageID 81–82.) Therefore, it should come as no surprise that the affidavit contains no mention of GPS data of the vehicles at the Princeton Residence after that point. Notwithstanding the relatively scant documentation of Rivers at the Princeton Residence after December 4, 2025, an "affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000). The Court here is satisfied that, in viewing the Search Warrant affidavit as a whole, the 17 recorded controlled purchases, along with Rivers' well documented connections to the Princeton Residence, adequately offset the purported staleness of Rivers' Princeton Residence sightings.

That said, the Court is unpersuaded by Rivers' staleness argument, and Magistrate Judge Silvain had a substantial basis for his probable cause determination in issuing the Search Warrant.

**D. *Leon* Good-Faith Exception**

Finally, and alternatively, Rivers maintains that the *Leon* good-faith exception does not apply here. (*See* Doc. No. 25 at PageID 63–64.) However, having found that Magistrate Judge Silvain possessed a substantial basis for his probable cause determination in issuing the Search Warrant, the Court need not delve into Rivers' good-faith reliance argument. *See United States v. Frechette*, 583 F.3d 374, 381 (6th Cir. 2009) ("There is no need to go into a lengthy analysis of whether the agents relied on the search warrant in good faith because the magistrate judge had a substantial basis for finding probable cause.").

## IV. CONCLUSION

Based on the foregoing, the Court hereby **DENIES** Rivers' Motion to Suppress Evidence (Doc. No. 25) in all respects.

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, November 17, 2026.

s/Thomas M. Rose

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE